Good morning. My name is Scott Sugarman. I am counsel for Joshua Harvest. The centerpiece of the state's case against Joshua Harvest was a three-hour videotaped confession. It was introduced at trial. It was a subject of testimony from various government witnesses. In order to understand whether the state courts correctly admitted part of that statement, which is what's before you today, it's important to remember the setting in which that confession was obtained. What we have in 1993 were three experienced homicide detectives with decades of experience interrogating a 17-year-old young man in an isolated interrogation room. That's the context for it. And they rotated in and out throughout the course of the interview. The Court has before it the videotape itself. It was admitted in evidence, and I would urge the Court to look at it. Does it matter if we look at it, or are we bound by what the state court said? You are not bound by what the state court said if the state court came to a finding of fact that is clearly unreasonable. So if, in fact, the court said – Does that go in both directions? Yes, I think that's correct. I don't think – See, when I read the state court – when I read the transcript, when I read the state court's decision, I read Joshua Harvis to be saying that it wasn't that he wanted to cut off the interview. It's just that he didn't want to be a snitch and be revealed as a snitch. But then when I read the state court decision, the state court decision said that Joshua said, I want to cut off the interview. And so they violated his rights by not cutting off the interview. And what I'm wondering is, can we reexamine that and say, no, he didn't want to cut off the interview. He just didn't want to reveal certain information. The – you can divide his assertions of the Fifth Amendment in theory in two parts. What he said physically during the time he's been questioned about the death of Mr. Gialoris and those during the death of Mr. Vigil. During the first time, and the Court's referring to that time because that's when the state court of appeals spoke, he never, ever referred to not wanting to be a snitch. He just kept saying, I don't want to talk. I don't want to talk. I don't want to talk. I don't want to say anything about this. Well, he didn't say, I don't want to talk, as I recall. He said, I don't want to talk about that. Maybe I'm missing a reference. Go ahead and give me a page number.  It begins basically on page 27 of the excerpt of record in terms of the transcript. Now, as the Court knows, the transcript was not admitted in evidence, although it was provided to the jury for their aid. It's the tape itself that's relevant. And the first time he says, I don't want to talk about it. And then later – About it. And about it seems to be where he says, I didn't mean for him to die, though. I don't even want to talk about it. Right. It seems to me if you find that the State court is clearly wrong, they're completely off the charts about their interpretation, then in theory you can go back and look at this. But he makes that assertion of I don't want to say anything, I don't want to talk, I don't want to talk about it, about half a dozen times in four or five minutes. And it's very clear, even more so from the tape than from the transcript, that he's saying he's not going to talk. And he doesn't say the reason. But the reason that's constitutionally – In the next page he said the policeman asks, did Chucky throw something? And he says, I don't want to say nothing about that. It looks like he doesn't want to snitch on Chucky. You could speculate to his reason, but the Fifth Amendment has never in any Supreme Court case – Clear. Has ever said the reason matters. I can decide not to talk because I – It's not a question of whether the reason why he doesn't want to talk matters. It's a question of whether he's saying he doesn't want to talk or whether he just doesn't want to snitch on Chucky. No, he says, I don't want to talk. He may be, I don't want to talk because he doesn't want to snitch on Chucky. It may be because he feels bad about what happened. It may be because he knows in his heart he has a Fifth Amendment right. The person says, if you're talking about several things, I want to talk to you about your job and your child's birthday party and your divorce. Now let's talk about your divorce. I don't want to talk about that. The implication is, I'm happy to talk with you. Maybe I'll talk to you about my job and my child's birthday party, but I won't talk to you about my divorce. That raises a second question, one before you, which is when he asserted, I don't want to talk, is it limited to the conversation about the death of Mr. G. Olores or does it extend to the death of Mr. Vigil? And I submit to you, because that's directly before you, that you cannot sustain what the state court did unless you reject two bodies of clear federal law for 60 years. Because there is no question in the record that he repeatedly said, I don't want to talk, or I don't want to talk about this, or I'm not going to say. And it's equally clear that never once did any agent ever honor that invocation. So if you take the state's position at its strongest, he was only talking about a limited topic. He only didn't want to say who was there. They never stopped asking him that question. And there are two bodies of law. The first begins 65 years ago in Johnson v. Zerps, in which the court told us that this body and every body must be exceptionally protective and deferential to assertion of constitutional rights. Well, but I guess you're saying we have to defer to the state's finding that on the, is it, how do you say it?  G. Olores. G. Olores on the, that he invoked on G. Olores. But we shouldn't defer to the state on the findings that it was limited to the G. Olores situation. There are two different standards that come into effect. Well, I'm having a little hard time pulling them apart there. I don't mean to confuse them, and I apologize if I have. The Attorney General is correct that under habeas review, which is where we are, there's a certain deference on legal questions. But there are legal questions, and there is no question, as he concedes in his brief, this Court reviews the legal questions de novo. All right. But some of these are factual findings. As to what he says, both the court of appeals and the district court below said there's no dispute about what was said. We have a videotape. It's in the district court opinion. It's in the court of appeals opinion. This Court has the videotape that I have submitted to it. So the question would be, if the Court looked at it and the state court of appeals said, he said that light was red. And you listened to it and said, no, he says the light is green. It's very clear. You could reject that under 2254, because you would say it's clearly wrong. And we'll come to one of those issues in a moment. But otherwise, there's a certain factual deference to findings of fact. I would agree with that. Here, they listen to the check. But what are the findings of fact here, then? The findings of fact. What was said. That is a finding of fact, whether something was said, whether, in fact, he was interrogated by three officers or 25 officers. But whether that's an invocation of the right to remain silent in the Fifth Amendment is a legal conclusion. This Court reviews de novo. And I cited in my brief probably half a dozen cases, both from the Supreme Court and the circuit, that come to that conclusion. So those questions, you review de novo. And then, frankly, you have to make another step. Because of the deferential review under habeas, you don't get to reject the state court just because you disagree. You have to find their conclusions are contrary to clear Federal law or an unreasonable application. This Court knows. So here are the two bodies of United States Supreme Court decisions you have before you. One says you absolutely must grant deference to the assertion of a defendant's constitutional rights. From Johnson v. Serps, Michigan v. Jackson, and a whole list of cases that I discussed beginning at page 19 of my opening brief. The burden is on the government to show a waiver. Waivers are broadly, excuse me, narrowly construed. Assertions of right are broadly construed. All those are the standards. The second one is there's a special body of protections for the Fifth Amendment. And that, of course, is Miranda or begins with Miranda. Because it looked at what exactly occurred here in an enormously coercive environment and said because of that, while the defendant doesn't have to be told of his right to remain silent, we mandate you must. And we not only that, we mandate you tell him about his right to counsel. And they say something that I submit to you is unique in constitutional law. They say that the officers must scrupulously honor the invocation. I don't know if that phrase is anyplace else in constitutional law. So they are clearly mandating an extraordinary level of protection. Interestingly enough, it was followed by Mosley, in which they told courts below, the critical safeguard is the defendant's right to cut off questioning. And it's absolutely clear that never once did the officers stop. That's what you've got. The reason I submit to Elstead so often, and indeed both the Attorney General and I quote the exact same passage in Elstead, is that Elstead makes clear that for a Fifth Amendment violation, which is what we have here, that's what the California Court of Appeals found and what occurred, the rule is everything that follows stays out. Elstead created an exception for what the U.S. Supreme Court told us just three months ago for technical violations made in good faith. That's the Missouri v. Siebert case that I cited in my statement of supplemental authority. They make it very clear that the norm is exclusion for a Fifth Amendment violation as distinguished from simply a failure to warn Miranda violation. That's the standard. And that analysis from three months ago from the Supreme Court confirms precisely what I have said in my briefing to this Court and, in fact, what I argued to the California Court of Appeals. That's what you have to look at. That's the body of law. And then this Court would say, okay, what did he say? That's already been established. I would, again, urge you to look at the tape. And then the question is, what does he mean? What do we have? And he says over and over again, I don't want to talk. If I may jump to the question raised here about the motive issue you raised before, I would ask you to look at this because even if you conclude that the assertions made approximately 30 minutes into the interrogation of I don't want to talk about it, I don't want to talk. Assume that only applies to the defendant. I don't want to talk. The indication is he doesn't want to snitch and he doesn't like talking about the physical details of the murder of the homeless guy. But he's okay with talking about the guy with the prostitute. Well, that's interesting that you say that. I would direct your attention respectfully to beginning of page 44 of the excerpt of record. They have just begun to return to the vigil interrogation. And the characterization in the Attorney General's papers, indeed in the State Court below, is that all he's saying is I don't want to identify anybody else. And that begins at about 1531 of the tape. And I, again, urge you to go back in the tape. He's asked who was there. Not who else was there, but who was there. And he says, quote, I don't want to say that. Period. He's asked again. Now, take the Attorney General's position. Once he says he don't want to talk about any one topic, however small, it must be scrupulously honored. They didn't. A few minutes later, they return to the exact same question. Who was there? He again says, I don't want to say. Seems to be very clear. And let's assume he was motivated. Because I don't want to say that. Okay. He doesn't say I don't want to talk to you. But they never honored that. If he says, just limit it to that, all right. Take the Attorney General's best position. I don't want to say that. That's who was there. Remember, he was one of the who was there. Well, as long as he's willing to submit to an interrogation, why do they have to honor his desire not to talk about particular topics? Because the Supreme Court has said so. They said he may control it. In fact, the Attorney General's position, he can control the topics, the timing, anything he wants. That's true in Miranda. It's true in Mosley. It's true in Siebert, for that matter, in terms of its analysis back. He can control what is said. In fact, the Attorney General makes that argument very powerfully because he's trying to argue only limited topics to which there was an invocation. But, in fact, they never honor that. But go just a few, just another page further. The officer says, and I quote from page 47 of the excerpt, well, walk me through it. How it happened. What happened. Who did what. That's telling me what happened. That's as broad a question as you can get. And after saying, well, we all threw our chisels through the window, I don't want to say anything. You can't get much clearer than that. Do they honor it? No. They continue to question him for about two hours after that. It seems to me that even if the Court rejects the arguments I've made, that when he first asserted his right to remain silent, his Fifth Amendment right to end the interrogation, it only applied, as the State court said, to the geolores death. Then these statements, which are part of the record, of which there is no dispute as to what was said, mean that he asserted his right, and the cops had to abide by it, and they refused. And it seems to me that that's where the State court goes wrong. It is unreasonable to come to any conclusion. It's directly contrary to the notion expressed in Miranda and Mosley that he can cut off any topic, any time, any way. And it's the circuit's rules from Lorenzo from 25 years ago to now that if he indicates in any manner that he doesn't want to talk, that's it. And this Court, as you just noted in the last argument in the Williams case, is bound by Lorenzo and those cases which have said all we need is any indication he doesn't want to continue. I'd like to speak to one other issue for a moment before I say the two minutes. Could it have been more consistent just to either leave it all out or keep it all in? I mean – His statement? Yes. I mean, as to – because he never specifically says, you know, I'm invoking my fifth or anything like that. It – the whole – all your arguments really are the same as to the – to one murder and the other, right? Your Honor, the language used does differ slightly in places, I would agree, in terms of what was said. But the U.S. Supreme Court has made it very clear, particularly with criminal defendants in custody, they need not speak with the articulation of an oxfordon. It's enough to say, and I've cited cases where someone says, I don't want to talk. That's enough. Leave me alone. I don't want to say anything. In fact, the exact words here have been used in other cases, and I cited them in the briefs. And that's been held to be enough. Because the standard is, if a person says in any manner, at any time, they are not willing to freely talk, that's it. That is the standard you have before you. And that's the standard you must accept. But does – everywhere in this, does he say, I don't want to talk about that, I don't want to talk about it? Or does he just say, I don't want to talk to you? Does he say that anywhere? I don't want to say anything. That seems to me sufficient. That's on page 48. Now, even if you say, I don't want to talk about it, since he repeats that between pages 27 and roughly 33 of the transcript four different times when they continue to try to ask him questions, it seems to me a fair reading, indeed one that's not clearly erroneous, that he was cutting off the interrogation by Gialloris. You could only find it the contrary by saying that the State court on that issue was completely out to lunch, and I don't think you can go there. Let me take just a moment on the one other – on the other – one of the issues raised, and then if I may, I'll save a moment or two. The other issue we have here has to do with the propriety of the Talgic 2.15 modified instruction. As the Attorney General concedes, because he cites it in his brief, the California courts have rejected that instruction as it applies to murder, which is what you have here. Jury instructions are the only advice the jury gets about how to apply the law. So they were told here that if there was – if he had recent possession of stolen property, here's the truck, and any slight corroborating evidence, it was insufficient to convict him. This Circuit's law is seen in Hannah and Schwerdman, where six different judges of this Circuit have said in directly analogous circumstances, that violates due process. And indeed, the State concedes that to infer murder from recent possession of stolen property and some slight corroborating evidence is irrational. If it's irrational, then under the standards that we see in Leary and Ulster County from the U.S. Supreme Court, then that instruction is unconstitutional, it denied him due process, and it clearly prejudiced him. And it seems to me that that standard, which is really not fully addressed for the State court, though the issue was clearly raised, is there. And the instruction misleads the jury. What it does, it takes them away from considering all the facts and all the elements and says, focus on these two narrow facts. Did he possess the truck? Is there some other slight corroborating evidence? It distorts the deliberative process. That's what's wrong with it. And that's why he's entitled to a new trial on this issue. And I'll reserve the rest of my time unless the Court has questions. Thank you. Thank you, counsel. Good morning. I have lots to say, but I think I'll answer your questions first if you have them right off. Let me start you off with the last thing the defense counsel said, because it may be something brief that we can get out of the way. The instruction. It looked to me like a good jury instruction in a case where a person is charged with burglary or robbery, and he says, I wasn't even there. And the prosecution says, well, he's got the victim's radio. How did he get the radio if he wasn't even there? Well, a friend sold it to me. The instruction seems to be addressed to that type of case to tell the jury if he's got the victim's property and there's some other slight corroborating evidence, it might be enough to tie him to the scene. In this case, though, he's not saying I wasn't even there. The question is whether it was murder. And it's hard for me to see why the instruction is useful to the jury, whether there's any reasonable way that a jury could make the connection permitted by the inference that the instruction sets up. That seems to be the Ulster test for whether it's constitutional. Well, the defense theory was that there was no robbery because I just came along later and hopped in the truck. So that was the defense theory. But the jury has to decide whether there was, in fact, a robbery. And part of a robbery is a taking. And, therefore, the jury is aptly instructed that if you ---- You're saying the recently stolen property makes it more likely that he's guilty of the robbery. Yes. And then you go from that to that's why it's a felony murder, that it was a murderer during a robbery? Well, that's part of the decision-making process. I would certainly concede that if the jury was instructed that all you need to find in order to convict this person of felony murder is that after the crime he possessed stolen property, then that would be problematic. I thought that the idea was that the defense was saying robbery was an afterthought. Yes. And the prosecution is trying to make it felony murder and not just manslaughter by saying the point of this was in part the robbery. Yes. And I don't see where ---- I see where the instruction could let a jury draw that inference, and I don't see where it's a rational inference. Well, I think what we're disagreeing here is that you, as I understand your point, is that you're saying that the instructions need to be tailored to the defense theory of the case. And what I'm saying ---- Whether it's an instruction or not as a judge always depends on what the evidence was in the case. What the evidence was, not just what the defense theory was. The prosecution has to prove a robbery here, not just an after-formed intent theft. And that instruction is good for that purpose, even though it's not the defense theory of the case. But I think we're losing sight of the bigger issue here. And the bigger issue is a multiple layer of deference to the state court. Was it reasonable for the state court to find that there was no reasonable likelihood, given all the relevant circumstances, that the jury would have taken this instruction out of context and simply said, I can convict this person of felony murder simply by finding that he had the truck. I thought that's what the instruction said. No. The truck plus some blood is enough. The instruction said with some slight corroboration, you can convict him of robbery. I don't believe it said a felony murder, but I'm not sure about that. It wasn't with the crime charged. It tends to connect the defendant with the crime charged. So what was the defendant charged with? He was charged with murder. I don't believe he was charged with felony murder. That was argued. Was he charged with robbery? Yes. But the instruction didn't specify. It only applied to robbery. You know, I don't remember if he was charged with robbery. He was not. Yes. So he was charged with murder. But it was clearly on a robbery theory. Now, the point that we have to stress here. If you read the instruction that it tends to prove that he's guilty of the crime charged, if he's only charged with murder, then you're making a link between the recently stolen property with the murder. Yes, I am making a link. And the reason that I'm making the link is because when you consider this instruction, in light of all the other instructions and in light of all the arguments of counsel, in light of all the relevant circumstances, which Estelle v. McGuire teaches us we must do, then there is no reasonable likelihood that the jury is going to take this instruction out of context and simply say because there's blood and because there's a recently, a possession of recently stolen property that we're going to convict this person of felony murder. There was no such suggestion by the prosecutor that you can do that. The prosecutor said look at all the evidence, in essence. Does it matter that the language is permissive as opposed to mandatory in terms of the presumption? When you say does it matter, what do you mean by it? Well, it doesn't say this means that. It says you may consider this for this purpose. So it's a permissive presumption, not a mandatory one. Of course it matters, and of course any error would be the standard, I believe, is different, right? The standard under Ulster County is can you make, can you reasonably make the permissive presumption, whereas if it was a mandatory presumption, it would be simply wrong right off, okay? But when we decide can you make this permissive presumption, you simply can't look at the four corners of this instruction. You have to interpret it in the context of everything else that the jury was instructed and that the parties argued here. And the prosecutor did not say look, convict this man of felony murder because he possessed the truck and you have some other slight corroboration. And that's not a reasonable inference from the record, and it certainly wasn't unreasonable for the state appellate court to have not gone that route. Let me ask you about something else. The Pittman hearsay. Yeah. There are a lot of cases. I may be mixing them up, but am I remembering right that it came in under the rule of completeness? Yes. That's our argument. It struck me as not making any sense. The rule of completeness is that if a party introduces part of a statement, then in order to avoid possible misleading of the jury, the opposite party, the opposing party, can introduce the remainder of the statement. Right. That is so that the complete statement can be considered by the jury in order to have context. Right. Kind of like when I was talking to your opponent and he quoted part of a statement, I don't want to talk, and I said about that. That's a rule of completeness issue. Now, it has nothing to do with the hearsay rule, and I'm not aware of any authority that says the rule of completeness can supersede the hearsay rule, let alone the constitutional right of confrontation. I just don't get how Pittman's accusation of harvest can come in just because some other language of Pittman's could come in. Well, it is not hearsay if it is being admitted for a purpose other than the truth of the matter asserted. Was it? I thought it was admitted for the truth of the matter asserted that harvest did it. No. It was admitted to show that Pittman made other statements as well as the statement that the defense attorney brought out. But there was no limiting instruction given, was there? I couldn't find any limiting instruction saying this was admitted only for this limited purpose. I don't believe there was. But let's look at the prosecutor's argument. The jury was free to use it then as evidence that harvest must have done it, Pittman did so. Well, I don't – And was the jury free to do that? Was the jury free to do it? Yeah. Did the judge tell him not to? No, the judge did not tell him not to. Is there any reason the jury couldn't do that? There was no reason the jury couldn't do it. There was every reason to think that the jury wouldn't do it. Now, let me back up a second here because I haven't articulated the rule of completeness under which this came in, okay? Defense attorney says, didn't Pittman – to the officer, didn't Pittman say X? And the officer says, yes, Pittman did say X, okay? And that was consistent with what harvest had told the officer. So the clear implication from what defense attorney is saying and the implication that the jury will draw from that is that Pittman corroborated what harvest said. That is the impression that the defense attorney is trying to create here, quite understandably. Now, the prosecutor comes back and says, wait a second. Pittman didn't in the main corroborate what harvest said. Pittman contradicted what harvest said, and the jury deserves to know that. The jury deserves to know that these people gave conflicting stories, not merely consistent stories. Now, when the prosecutor then talks to the jury, the prosecutor – and this goes to Judge Kleinfeld's point about whether the jury – But the defense opened the door is what you're saying. Exactly. But beyond that, as to the question of how the jury would interpret this, the prosecutor does not say, look, take this for the truth. To the contrary, the prosecutor says Pittman's a liar. He's a – Well, the prosecutor doesn't get to give the instructions to the jury. The judge gets to do that. I understand that. But we interpret the instructions in light of the prosecutor's arguments and the defense counsel's arguments and all relevant circumstances at the trial. Now, the jury is going to say about this evidence, look, the prosecutor is not telling me to believe what Pittman said. The prosecutor is telling me that Pittman's a liar. Pittman's a liar just like harvest is a liar. I don't know. I talked to jurors who said, well, that prosecutor, he was just a kid, didn't know what was going on. But I heard the testimony. Well, the testimony of Pittman, it's obvious that he was a liar. There's no doubt about it. He's telling a story that is going to – first of all, that's inconsistent, that he keeps changing. First, he denies being there. And then he, you know, gradually owns up to it. But everybody agreed that Pittman was a liar. The only thing the prosecutor was trying to say is don't you bring in Pittman to corroborate harvest and make the jury believe that therefore harvest is credible. Why didn't the prosecutor get an admonition to that effect then? I don't know. Let me ask you about one other thing. Why didn't the police have to stop talking to harvest once he said, I don't want to talk about that anymore? The police did have to stop talking to him about the Gialouris killing. Okay? Now, if you take the – That's the homeless guy? Yes. That's what he said he didn't want to talk about anymore. Now, we just flatly – well, I won't characterize appellant's arguments because I don't understand them very well. But in the context of what the discussion was about, it was an invocation with respect to Gialouris alone. At a minimum, the state – You're basically taking the position that I was suggesting in my colloquy with your opponent, that he was saying I don't want to talk about the homeless guy, not that I don't want to talk to you. I don't want to talk to you about the homeless guy. Okay? I don't want to talk about Gialouris anymore. I am upset. He was crying, whatever. It was clearly in the context of questions about Gialouris that he said I don't want to talk about that anymore. Okay? At a minimum, it was reasonable for the state appellate court to reach that conclusion. Okay? So at that point – Well, now, is that a factual finding? Because I heard counsel for the appellant to basically say that it's all – these are all legal, that there aren't any factual findings. It doesn't matter. It doesn't matter because the question for you is whether it was reasonable, whether you characterize it as legal, factual, or some combination. The question for you is whether it was reasonable for the state appellate court to conclude that he was invoking with respect to Gialouris but not with respect to vigil. So we don't really need to give any deference to any findings from your – were there any factual findings that we have to give deference to? I confess to being mystified by this distinction between deference to factual findings and deference to legal findings. Under AEDPA, you must give deference in the sense that you must accept the state court's rulings if they were reasonable applications of clearly established law as set down by the United States Supreme Court. Okay? So if the state appellate court acted reasonably, even if incorrectly, in finding that he invoked with respect to Gialouris and not with respect to vigil, you must defer, you must accept that finding. The – if you read the reply brief of appellant, you would be hard-pressed to know that this is an AEDPA case. That is my major criticism of – not the only one, but a major criticism of appellant's position. I'll just read you from page 1. The attorney general has not identified any court that has ever upheld the admission of a defendant's statement under these circumstances. And again, on page 13, respondent has not cited one decision from any court upholding the admission of a confession under these circumstances. That is not my burden. I don't have to cite any court that has ever upheld a confession – the admission of a confession under these circumstances. I have to cite United States Supreme Court authority and persuade you that it is reasonable for the state appellate court in applying that United States Supreme Court authority to reach the decisions that it did. We have taken the position repeatedly, as did the state appellate court, that you may selectively invoke your right to silence. That is to say, if you waive with respect to two crimes, say, I'm going to talk about it, that you can then say, you know, I retract my waiver with respect to crime A, but not with respect to crime B, and therefore the cops have to stop talking about, to me, about crime A, but they can go on talking about crime B. Now, I believe that appellant would agree with that, that that is a reasonable interpretation of United States Supreme Court authority. The question that we disagree about is whether the state appellate court was reasonable in finding that that is exactly what occurred here. Now we have a new argument. The new argument, as I understand appellant to be making, is, you know, I selectively invoked with respect to vigil. The second guy, I said, I don't want to talk about who was there, so you can't talk to me about who was there or who else was there, or you can't talk to me unless we keep this confidential or whatever. Okay? The problem with that argument, it is never made. It is unexhausted. He never made this in state court. This is a new takeoff designed to rebut what we have been saying here. The argument has always been I invoked with respect to vigil. I said I did not want to talk about vigil, or else you must deem my invocation with respect to Gialouris or whatever my invocation was to apply as well to vigil. So we are now doing what defendants so often do, which is shift sands, and that is an unexhausted argument. I've got 46 seconds, and I think I'll give everybody a break and not use them. Thank you, counsel. You're welcome. Let me answer a certain factual question you asked of the Attorney General that he got wrong. Page 143 of the excerpt of record makes it clear that Mr. Harvest was charged only with murder, never with robbery. He was charged with two homicides. The first killer, whose words were failed to direct, was Hal Hauserman, who has strived to capture and take down any evidence he found to be spot on.  Let me give you two points. Secondarily, the instruction that we talked about, modified 2.15, specifically says it is sufficient to convict, the word sufficient is in the instruction 2.15, if they find recent possession of stolen property and any corroborating evidence, however slight, of the charged crime murder. And as the Court suggested, like blood. And this instruction has been, its equivalent has been condemned by this Court in Hanna and Schwindman. And in that case, specifically in Hanna, there was an instruction just like the one the Attorney General refers to that said consider all the evidence. And the Court said that's not enough. Because what this instruction does, it takes the jury away from the careful, long instructions about what robbery is, what it means to do a felony murder, how a murder can come from a robbery, and said ignore them. I don't know if we can use Ninth Circuit authority, if it has any benefit at all to us. Because 2250.4d says that the State court determination has to be an unreasonable application of U.S. Supreme Court authority. Right. But it's been the repeated statements of this Court that statements from the Ninth Circuit interpreting the U.S. Supreme Court, which is what Hanna and Schwindman do. They both interpret Ulster County and Sandstrom are, in fact, guiding light as to what, in fact, the U.S. Supreme Court has to say on these issues. And the roots of my case, as the Court saw in the opening brief, are all Supreme Court decisions. Leary, Ulster County, and Sandstrom laying out the standards, and most particularly Romano. Let me respond to two things at the end of his argument, which are complete nonsense. He argues that I've said for the first time at this podium that my client asserted his right to remain silent during the interrogation of vigil. It sits in the opening brief on page 14, all the exact same quotes I said to you here. He never said one word in his reply. And they are repeated verbatim in my brief in the Court of Appeals and in the California Supreme Court. That's complete nonsense. This issue has been raised from the first brief filed in the California Courts of Appeal to say that he repeatedly asserted. I have argued he asserted from the outset. But if you don't agree with that, then he separately asserted during his interrogation of vigil, and the quotations I have given you refer to that. Lastly, he says that he quotes from me saying he cited no case. He doesn't have to. How does this Court decide if a particular legal conclusion is reasonable or not other than to look into the extant decisions of the Supreme Court and appellate courts to decide what, in fact, is the law? And the fact that there is no case that sustains him, and they all go the other way, shows that the California Court of Appeals, in admitting the statements as to vigil, was unreasonable. And he agrees with me that if it was unreasonable, reversal follows and a new trial. I'll take any questions the Court has. Otherwise, my time has expired. Thank you, counsel. Thank you. Harvest v. Castro is submitted. Thank you, Your Honor. Navaretti v. Plyler is submitted. We'll hear United States v. Garcia and Powers. Thanks. Counsel, I forgot to mention something. Sometimes in a two-defendant case, we start asking a lot of questions of the lawyer for the first defendant and the lawyer for the second defendant never gets to argue. If you would like us to divide up the time, I'll just tell the clerk however many minutes you want. Your Honor, Dennis Reardon appearing. And I will actually make the argument on behalf of both defendants, Your Honor. I would ask the Court that if during rebuttal there is some occasion for Mr. Pavone to address a matter of particular concern to him, that he be allowed to do so. But it is my intention. Let's work it out. So he's not jumping up in the middle of your argument in chief. It will distract him. But just as you say, we'll be fine. Yes. Yes, Your Honor.
judges: Oakes , Kleinfeld, Callahan